## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **INES ALFRED GARCIA,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **CASE NO. 5:08-cv-1258-SLB** |
| | } | |
| **FLETCHER KILLINGSWORTH;** | } | |
| **CITY OF HUNTSVILLE,** | } | |
| **ALABAMA,** | } | |
| | } | |
| **Defendants.** | } | |

## <u>MEMORANDUM OPINION</u>

This case is currently before the court on the following motions: defendant City of Huntsville's (the "COH") Motion for Summary Judgment, (Doc. 24),[1] defendant Fletcher Killingsworth's ("Investigator Killingsworth") Motion for Summary Judgment, (Doc. 25), and plaintiff Ines Alfred Garcia's ("Garcia") Motion in Limine, (Doc. 39). Garcia has sued Investigator Killingsworth under 42 U.S.C. § 1983, alleging violations of his Fourth Amendment right to be free from unreasonable seizure and excessive force. (Doc. 14 at ¶¶ 52-81.) Garcia has also brought related state law claims against both Investigator Killingsworth and the COH (collectively referred to as the "Defendants"). (*See id.* at ¶¶ 82-91.) Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that Defendants' Motions for

---

[1] Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

Summary Judgment, (Docs. 24 & 25), are due to be granted.  As a result, Garcia's Motion in Limine, (Doc. 39), is due to be denied as moot.

## I. <u>SUMMARY JUDGMENT STANDARD OF REVIEW</u>

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of showing no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is "a genuine issue for trial."  Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, "the [court's] function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Id.* at 249.  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions," and therefore, "evidence of the non-movant is to be believed, and all justifiable inferences are to

be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)).  Nevertheless, "the nonmovant need not be given the benefit of every inference but only of every *reasonable* inference." *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999) (citing *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988)) (emphasis added).

## II.  FACTUAL AND PROCEDURAL HISTORY

### A.   THE MIXED MARTIAL ARTS EVENT

On the evening of August 19, 2006, Garcia, who stands approximately five feet nine inches tall and weighs 195 pounds, along with his friends, Nathan Farmer ("Farmer") and Paul Kirk ("Kirk"), attended a mixed martial arts event at the Von Braun Center (the "VBC") in Huntsville, Alabama.  (Doc. 26, Ex. A at 96-97, 100-01, Ex. J.)  While at the event, Garcia ate dinner and consumed five to six beers over a three-hour period.   (*Id.*, Ex. A at 92-93, 100-02.)  There were thousands of people at the event, which filled the VBC to capacity.  (*Id.* at 94, Ex. E at 29-30.)  Aside from the fighting between the participants of the event, there were also "quite a bit of fights" between the spectators who attended it.  (*Id.*, Ex. A at 195.)

### B.   THE 911 CALL

At approximately 10:14 p.m. that night, a 911 call was placed by Jonathan Johnson, requesting police assistance at the VBC.  (*Id.*, Ex. B at 18, Ex. G, Ex. I.)  Investigator

Killingsworth and Officer Quinn Campbell ("Officer Campbell") of the Huntsville Police Department responded to the call.  (*Id.*, Ex. B at 17-19, Ex. C at 8-9, Ex. I, Ex. J.) Investigator Killingsworth arrived at the VBC at approximately the same time as Officer Campbell, and made contact with a male subject in front of the South Hall of the facility. (*Id.*, Ex. B at 17-23, 40, Ex. C at 8, 14-15, Ex. J.)  The male subject's brother, Jonathan Johnson, was the individual who had placed the 911 call; Jonathan Johnson had already left the area when the police officers arrived.  (*Id.*, Ex. B at 22-24, 40, Ex. C at 9, 14-15, Ex. G, Ex. J.)  It appeared that the male subject had been in an altercation.  (*Id.*, Ex. U at 4.)  The male subject was upset because his brother, Jonathan Johnson, had been assaulted, but he did not give Investigator Killingsworth or Officer Campbell any trouble.  (*Id.*, Ex. B at 19, 22-24, Ex. G.)

## C.   GARCIA LEAVES THE EVENT

Garcia, Farmer, and Kirk stayed until the event ended at around 10:00 p.m. or 11:00 p.m.  (*Id.*, Ex. A at 117.)  When the event ended, they exited the South Hall of the VBC and started walking down the stairs.  (*Id.* at 116-21.)  Garcia has admitted that he was "legally intoxicated" at this point, although he and Kirk deny that he appeared intoxicated.  (*See id.* at 106-08, 114, Ex. E at 18-19, 53-55; Doc. 29 at 3; Doc. 31 at 7.)  While at the top of the stairs, Garcia claims that he saw Investigator Killingsworth and Officer Campbell making an arrest. (Doc. 26, Ex. A at 122-23.) Investigator Killingsworth and Officer Campbell were

4

actually talking to the male subject whose brother, Jonathan Johnson, had been assaulted. (*Id.*, Ex. B at 17-24.)

### D.    GARCIA MAKES A COMMENT REGARDING POLICE BRUTALITY

At that moment, Garcia pointed at the officers and stated, "[h]ey, look, Paul, a little police brutality." (*Id.*, Ex. A at 125-27, Ex. D at 22.)  Farmer testified that Garcia's comment was "off color, in [his] opinion." (*Id.*, Ex. D at 22.)  Although the parties dispute how loudly Garcia made the statement, the parties agree that it was loud enough to be heard ten to fifteen yards away, and that Investigator Killingsworth was approximately ten to fifteen yards from Garcia at the time he made it. (*See id.*, Ex. B at 19-20, Ex. D at 23-28, 31-32, Ex. E at 35-38, 70-74; Doc. 29 at 4-5; Doc. 31 at 7-8.)  Investigator Killingsworth told Garcia to keep walking. (Doc. 26, Ex. B at 20, Ex. C at 29, Ex. D at 26-28.)  Garcia maintains that he did not make anymore comments regarding police brutality. (*See id.*, Ex. A at 156, Ex. D at 26-28.)  He also claims that he did not curse when making the comment about police brutality, and did not curse prior to his arrest. (*Id.*, Ex. A at 156, Ex. D at 26-28, 57-60.)  Instead, Garcia contends he kept walking. (*Id.*, Ex. A at 175, Ex. D at 26-28.)

The officers followed Garcia, who had continued to walk on the sidewalk alongside Monroe Street. (*Id.*, Ex. A at 115-16, 174-76.)  Garcia has admitted that "cars [were] going left and right." (*Id.* at 179.)  While following Garcia, Garcia maintains that Investigator Killingsworth began asking him to clarify his earlier comment. (*Id.* at 176-77, 182-84.)

Garcia claims that Investigator Killingsworth kept repeating, "[b]e a man, say what you said." (*Id.* at 182-83.)  Then, approximately fifty to seventy-five yards from where Garcia initially walked past the officers, Investigator Killingsworth caught up with Garcia. (*See id.* at 183, Ex. B at 20-21.)  Garcia contends that Investigator Killingsworth again demanded that he repeat his comment. (*Id.*, Ex. A at 183-84.)  Garcia states that he responded that he had not directed the comment at Investigator Killingsworth. (*Id.* at 184.)

## E.    GARCIA IS ARRESTED FOR PUBLIC INTOXICATION

At that point, Investigator Killingsworth informed Garcia that he was under arrest for public intoxication.[2]  (*Id.*)    Garcia put his hands behind his back for Investigator Killingsworth to place handcuffs around his wrists. (*Id.* at 184.)  Garcia insists that he did not resist arrest or attempt to escape, but that Investigator Killingsworth nevertheless grabbed

---

[2] Under Alabama law, "[a] person commits the crime of public intoxication if he appears in a public place under the influence of alcohol, narcotics or other drug to the degree that he endangers himself or another person or property, or by boisterous and offensive conduct annoys another person in his vicinity." Ala. Code § 13A-11-10 (1975).  In the instant case, Investigator Killingsworth testified that he arrested Garcia for public intoxication because Garcia was swaying and staggering, and appeared intoxicated while walking, smelled of alcohol, and had repeatedly used loud, profane, and offensive language in a crowded, public place despite being told to stop yelling and creating a disturbance. (Doc. 26, Ex. B at 19-21, 30, Ex. U at 4-5.)  However, as stated above, Garcia claims that he only made a single comment about police brutality, and denies that he cursed prior to his arrest. (*See id.*, Ex. A at 155-56, 215.)  Garcia has also introduced evidence that he did not sway or stagger while walking or otherwise seem intoxicated, and indeed maintains he did not "feel drunk," although he admitted drinking five to six beers while at the event, and acknowledged that Investigator Killingsworth probably smelled alcohol on his breath. (*Id.* at 114, 151-52, 159-61, Ex. E at 54-55; Doc. 31 at 8, 11-12.)  For purposes of summary judgment, all disputed facts, but only reasonable inferences, must be resolved in favor of Garcia, the non-movant. *See Anderson*, 477 U.S. at 255; *Graham*, 193 F.3d at 1282.

his arm, twisted it up and around his back, and "bowed" Garcia over while handcuffing him, causing Garcia "severe pain and mental anguish." (*Id.* at 184-85, Ex. Q, Ex. R; Doc. 31 at 14.)  Garcia states that he pleaded with Investigator Killingsworth to stop twisting his arm, and informed him that he was not resisting arrest. (Doc. 26, Ex. A at 185.)  Garcia further maintains that Investigator Killingsworth continued to twist his arm, which caused a "pop" in his right elbow.[3]  (*Id.* at 184-90, 220.)  After placing handcuffs on Garcia, Investigator Killingsworth and Officer Campbell escorted him back to a patrol car, placed him into the car, and transported him to jail.  (*Id.* at 189-90, 197, Ex. B at 21-22, Ex. C at 26.)  Garcia was charged with public intoxication.  (*Id.* at Ex. L.)  After three continuances, however, the charge was nolle prossed.  (*Id.*, Ex. B at 46-47, Ex. L.)

F.   GARCIA'S CLAIMED INJURIES AND COMPLAINT

Following the incident, Dr. Phillip Maddux diagnosed Garcia's injury as synovitis[4] in the lining of his right elbow joint, (*id.*, Ex. F at 29-33), which Garcia claims occurred as the result of Investigator Killingsworth's use of "excessive force" during the handcuffing

---

[3] Investigator Killingsworth and Officer Campbell both testified that they, together, handcuffed Garcia, and deny that they twisted his arm. (Doc. 26, Ex. B at 30-36, Ex. C at 22-26.) Investigator Killingsworth also testified that Garcia never complained of any injury. (*Id.*, Ex. B at 39.) However, for purposes of this motion, all disputed facts must be resolved in Garcia's favor. *See Anderson*, 477 U.S. at 255.

[4] Dr. Maddux testified that synovitis is "an inflammation of the lining of the joint." (Doc. 26, Ex. F at 29.)  He explained that "[a]ll joints have a lining like the elbow, and the lining of that tissue there is called synovium.  And when it becomes inflamed, it will get larger and it will get -- have an increased blood flow.  It makes it look red." (*Id.*)

process,[5] (*id.*, Ex. A at 225-29).  Dr. Maddux explained to Garcia that he could either wait and observe whether his symptoms abated with medication, or undergo arthroscopic surgery; Garcia elected to undergo surgery.  (*Id.* at 226-28, Ex. F at 13-14, 22-23.)

Garcia has incurred $12,176.04 in medical bills.  (*Id.*, Ex. A at 244-47.)  He further claims that he has "suffered emotionally from the incident because he does not trust police anymore and it has made him more short tempered." (*Id.* at 234-41; Doc. 31 at 15.)  Finally, Garcia claims that the injury has "affected his ability to work, play with his children, and have sex because he cannot use his arms like he used to do." (Doc. 26, Ex. A at 234-41; Doc. 31 at 15.)

Garcia filed his initial Complaint against Defendants on July 16, 2008.  (Doc. 1.)  He filed an Amended Complaint on March 6, 2009.  (Doc. 14.)  In the Amended Complaint, Garcia alleges five counts against Investigator Killingsworth under 42 U.S.C. § 1983 and under the state law of Alabama, including Count I, "Civil Rights - Illegal Arrest and excessive force," Count II, "Civil Rights - Excessive force," Count III, "False Imprisonment," Count IV, "Assault and Battery," and Count IV,[6] "Malicious Prosecution." (Doc. 14 at ¶¶ 52-91.)  Garcia alleges that the COH is also liable under Counts III and IV. (*Id.* at ¶¶ 82-88.)

_____

[5] Defendants note that "Garcia had reported an injury to his right arm several months *before* his arrest," and that "[c]oincidentally, this prior injury was also associated with a pop." (*See* Doc. 29 at 7 n.7.)  However, Garcia denies a correlation exists, (Doc. 26, Ex. A at 229-33), and Dr. Maddox testified that Investigator Killingsworth's handcuffing of Garcia "probably [did] not" exacerbate the prior injury, (*Id.*, Ex. at 33-35).

[6] Garcia's Amended Complaint designates two counts as "Count IV."

8

## III.  DISCUSSION

### A.  GARCIA'S § 1983 CLAIMS (COUNTS I AND II)

Defendants first argue that summary judgment is due to be granted in Investigator Killingsworth's favor with respect to Garcia's § 1983 claims, i.e. Counts I and II of the Amended Complaint, which allege illegal arrest and excessive force.  (Doc. 29 at 8.) Specifically, Defendants contend that Investigator Killingsworth is not liable under Counts I and II because he is protected by qualified immunity.  (Doc. 29 at 17.)

As stated by the Eleventh Circuit, "[q]ualified immunity offers complete protection for government officials sued in their individual capacity as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known."  *Oliver v. Fiorino*, 586 F.3d 898, 905 (11th Cir. 2009) (quoting *McCullough v. Antolini*, 559 F.3d 1201, 1204 (11th Cir. 2009)).  In determining whether a public official can assert qualified immunity from suit, a burden-shifting analysis is appropriate.  *See Vinyard v. Wilson*, 311 F.3d 1340, 1346-47 (11th Cir. 2002).  "To receive qualified immunity, the public official 'must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'"  *Id.* at 1346 (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)).  "'Once the [public official] establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate.'"  *Id.* (quoting *Lee*, 284 at 1194).

1.      Scope of Discretionary Authority

A public official is acting within the scope of his discretionary authority if the official was "(a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265-66 (11th Cir. 2004) (citing *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1185 n.17 (11th Cir. 1994)).  Here, Defendants maintain that "[t]here is no question Investigator Killingsworth was engaged in a discretionary function when he arrested and handcuffed Garcia."  (Doc. 29 at 17 n.12.)  The court agrees.  Indeed, as Defendants point out, (*see id.*), making arrests and determining the necessary force to use in making arrests are job-related functions for police officers, *see, e.g.*, *Crosby v. Monroe County*, 394 F.3d 1328, 1332 (11th Cir. 2004); *see also Holloman*, 370 F.3d at 1266 ("[I]n assessing whether a police officer may assert qualified immunity against a Fourth Amendment claim, we do not ask whether he has the right to engage in *unconstitutional* searches and seizures, but whether engaging in searches and seizures *in general* is a part of his job-related powers and responsibilities." (citing *Madiwale v. Savaiko*, 117 F.3d 1321, 1324 (11th Cir. 1997))).[7]  Therefore, the court finds that Investigator Killingsworth was

---

[7] Garcia alleges that Investigator Killingsworth was not engaged in a discretionary function, and therefore not entitled to qualified immunity, because "[i]n Alabama, a police officer lacks authority to effect a misdemeanor arrest without a warrant unless the arrestee commits the offense in the officer's presence." (Doc. 31 at 19 (citing Ala. Code § 15-10-3(a) (1975).)  Garcia's argument is without merit.  Primarily, as Defendants point out, (Doc. 35 at 6-7), "[t]here is no federal right not to be arrested in violation of state law," *See Knight v. Jacobson*, 300 F.3d 1272, 1275-76 (11th Cir. 2002) (rejecting argument that officer violated Fourth Amendment because arrest was for misdemeanor not committed in officer's presence, a violation of Florida state law).  Thus, the court agrees that even if Investigator Killingsworth's arrest violated Ala. Code § 15-10-3(a), which the

acting within his discretionary authority.

2.   <u>Whether Qualified Immunity is Appropriate</u>

Next, in that Defendants have established that Investigator Killingsworth was acting within the scope of his discretionary authority, "the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Vinyard*, 311 F.3d at 1346 (quoting *Lee*, 284 F.3d at 1194). "To overcome qualified immunity, the plaintiff must satisfy a two prong test; he must show that: (1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *Holloman*, 370 F.3d at 1264 (citing *Wilson v. Layne*, 526 U.S. 603, 609 (1999)) (footnote omitted). That said, the Supreme Court of the United States has recently clarified that "district courts and courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009). The court will apply the test separately for each of Garcia's § 1983 claims.

a.   *Count I (False Arrest)*

In Count I of the Amended Complaint, Garcia alleges that Investigator Killingsworth is liable under 42 U.S.C. § 1983 for violating his Fourth Amendment right to be free from

---

parties dispute, the violation would not remove his qualified immunity as to Garcia's § 1983 claims. *See id.*

unreasonable seizure.   (Doc. 14 at 6-8.)   Specifically, Garcia claims that Investigator Killingsworth "intentionally seized or arrested . . . Garcia without probable cause concerning the public intoxication charge." (*Id.* at 7.) To be sure, "[t]he Fourth Amendment's guarantee against unreasonable searches and seizures encompasses the right to be free from arrest without probable cause." *Crosby*, 394 F.3d at 1332 (citing *Von Stein v. Brescher*, 904 F.2d 572, 579 (11th Cir. 1990)).   Accordingly, to satisfy the first prong of the two prong test, Garcia must demonstrate that Investigator Killingsworth arrested Garcia for public intoxication without probable cause.[8] *See Holloman*, 370 F.3d at 1264.

However, a lack of actual probable cause "does not automatically strip the officer of qualified immunity protection." *Poulakis v. Rogers*, 341 F. App'x 523, 526 (11th Cir. 2009); *see also Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1137 (11th Cir. 2007) ("We do not automatically hold an officer liable for making an arrest that, when seen with the benefit of hindsight, turns out not to have been supported by probable cause.").   Instead, qualified immunity still applies "unless the court determines that the right violated was 'clearly established' at the time," i.e. the second prong of the two prong test. *Poulakis*, 341 F. App'x at 526 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled on other grounds by Pearson*, 129 S. Ct. 808).   "'The relevant, dispositive inquiry in determining whether a right is *clearly* established is whether it would be *clear* to a reasonable officer that his conduct was

---

[8] "Probable cause is 'defined in terms of facts and circumstances sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense.'" *Crosby*, 394 F.3d at 1332 (quoting *Gernstein v. Pugh*, 420 U.S. 103, 111 (1975)).

unlawful in the situation he confronted.'" *Vinyard*, 311 F.3d at 1350 (quoting *Saucier*, 533 U.S. at 202).  And, it is also clear that "this inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition."  *Oliver*, 586 F.3d at 905 (quoting *Lee*, 284 F.3d at 1194).

In cases alleging wrongful or false arrest, "[the Eleventh Circuit has] frequently framed the 'clearly established' prong as an 'arguable probable cause' inquiry."  *Poulakis*, 341 F. App'x at 526.  Thus, "[q]ualified immunity [still] applies when there was arguable probable cause for an arrest even if actual probable cause did not exist."  *Crosby*, 394 F.3d at 1332 (citing *Jones v. Cannon*, 174 F.3d 1271, 1283 n.3 (11th Cir. 1999)).  And, "[a]rguable probable cause exists if, under all of the facts and circumstances, an officer reasonably could–not necessarily would–have believed that probable cause was present."  *Id.* at 1332-33 (citing *Durruthy v. Pastor*, 351 F.3d 1080, 1089 (11th Cir. 2003)); *see also Scarbrough v. Myles*, 245 F.3d 1299, 1302-03 (11th Cir. 2001) ("Arguable probable cause does not require an arresting officer to prove every element of a crime or to obtain a confession before making an arrest, which would negate the concept of probable cause and transform arresting officers into prosecutors.")

As instructed by the Eleventh Circuit, to determine whether Garcia "has shown that the right violated was clearly established at the time of the violation," i.e. whether Investigator Killingsworth had arguable probable cause to arrest Garcia for public intoxication, this court must look to the precedent of the Supreme Court, the Eleventh Circuit, and the Supreme Court of Alabama, which "interpret[s] and appl[ies] the law in

13

similar circumstances.'"[9]  *Oliver*, 586 F.3d at 907 (quoting *Pearson*, 129 S. Ct. at 814-15, *and*

citing *McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007)).  It is well settled that "'if

case law, in factual terms, has not staked out a bright line, qualified immunity almost always

protects the defendant.'"  *Id.* (quoting *Priester v. City of Riviera Beach, Fla*, 208 F.3d 919,

926 (11th Cir. 2000)).  Here, the court is aware of no such case law, nor have the parties cited

any, which had staked out a bright line to put Investigator Killingsworth on fair and clear

notice that he lacked probable cause to arrest Garcia for public intoxication.  Indeed,

Defendants maintain that "this is the exact situation for which qualified immunity is

appropriate."  (Doc. 29 at 20.)  Still, the Eleventh Circuit has also made clear that:

> [I]n some cases, [a court] may find that the right is clearly established, even in the
> absence of case law.  One such instance is where the case is one of "obvious clarity"-
> i.e., where the officer's conduct "lies so obviously at the core of what the Fourth
> Amendment prohibits that the unlawfulness of the conduct was readily apparent to
> [the officer], notwithstanding the lack of fact-specific case law" on point.

*Oliver*, 586 F.3d at 907 (quoting *Vinyard*, 311 F.3d at 1355).  In this situation, the

appropriate question is "whether the statutory text itself is so clear and compelling in

[establishing that Garcia was not publicly intoxicated] that *no* reasonable officer could have

thought there was probable cause to effect an arrest."  *Poulakis*, 341 F. App'x at 529; *Crosby*,

394 F.3d at 1332.

        As aforementioned, under Alabama law, "[a] person commits the crime of public

---

        [9] The Eleventh Circuit noted that for § 1983 claims, courts should "look to the highest court
of the pertinent state to 'clearly establish' the law . . . because decisional law drawn from
intermediate state courts is too unsettled and too readily subject to split authority to put an officer
on clear notice that his conduct would be unlawful."  *See Poulakis*, 341 F. App'x at 528 (footnote
omitted).

intoxication if he appears in a public place under the influence of alcohol, narcotics or other drug to the degree that he endangers himself or another person or property, or by boisterous and offensive conduct annoys another person in his vicinity." Ala. Code § 13A-11-10. It is clear under the statute that "[t]he offense of public intoxication requires something more than '[m]ere drunkenness.'" *Martin v. Anderson*, 107 F. Supp. 2d 1342, 1354 (M.D. Ala. 1999) (quoting *Congo v. State*, 409 So.2d 475, 477 (Ala. Crim. App. 1981)).

In the instant case, for purposes of this motion, the facts, with their reasonable inferences, are that Garcia made a false comment about police brutality, which although not directed at the officers and not accompanied by profane language, was loud enough to be heard ten to fifteen yards away. (*See* Doc. 26, Ex. A at 155-56, 215, Ex. B at 19-20, Ex. D at 23-28, 31-32, Ex. E at 35-38, 70-74; Doc. 29 at 4-5; Doc. 31 at 7-8.) Garcia made the remark at night in a well-lit but crowded public place while leaving a mixed martial arts event, an event where fighting had been occurring between the spectators as well as the participants. (*See* Doc. 26, Ex. A at 94, 117-18, 195.) Garcia has acknowledged that the incident drew the attention of many people who were leaving the event.[10] (*See id.* at 157-58.)

---

[10] Indeed, Garcia testified that "[e]verybody was turning around to look." (Doc. 26, Ex. A at 157.) However, Garcia claims that everybody was stopping and turning around to look because of the actions of Investigator Killingsworth, not because of his actions or his remark about police brutality. (*See id.* at 157-58.) In contrast, Investigator Killingsworth maintains that Garcia created the disturbance, and that people on mere speculation and watching the incident due to Garcia's conduct. (*Id.*, Ex. B at 19-20.) For purposes of summary judgment, the court finds that it is mere speculation and conjecture as to why people were stopping and watching the incident. *See Cincinnati Ins. Co. v. Metro. Props., Inc.*, 806 F.2d 1541, 1544 (11th Cir. 1986) (stating that "[c]ase law holds that contentions which are based on mere speculation and conjecture are consequently impermissible [to withstand summary judgment]") (citation omitted); *see also Graham*, 193 F.3d at 1282 ("[T]he nonmovant need not be given the benefit of every inference but only of every *reasonable* inference."

Also, while Garcia did not sway or stagger while walking alongside Monroe Street, he was admittedly under the influence of alcohol with "cars going left and right," and has further conceded that Investigator Killingsworth probably smelled alcohol on his breath. (*Id.* at 114, 151-52, 159-61, 179, Ex. B at 37, Ex. E at 54-55; Doc. 31 at 8, 11-12.)  Simply put, while Garcia argues that "there are genuine issues of material fact that are in dispute," (Doc. 31 at 20-21), the court disagrees.  The court finds that Garcia has not met his burden of showing, even with all disputed facts and reasonable inferences drawn in his favor, that *no* reasonable officer could have thought there was probable cause to arrest him for "appear[ing] in a public place under the influence of alcohol . . . to the degree that he endanger[ed] himself or another person or property, or by boisterous and offensive conduct annoy[ed] another person in his vicinity," Ala. Code § 13A-11-10.  *See Oliver*, 586 F.3d at 907; *Poulakis*, 341 F. App'x at 529.  For that reason, Investigator Killingsworth's Motion for Summary Judgment is due to be granted as to Count I.

b.      *Count II (Excessive Force)*

Regarding Count II of the Amended Complaint, Garcia alleges that Investigator Killingsworth is liable under 42 U.S.C. § 1983 for violating his Fourth Amendment right to be free from excessive force.  (Doc. 14 at ¶¶ 67-81.)  Specifically, Garcia alleges that "every

---

(citing *Brown*, 848 F.2d at 1540 n.12)) (emphasis added).  As a result, while it is undisputed that people stopped to observe the incident, the court will not speculate as to their subjective reasons for doing so.

citizen has the right not to be subjected to excessive or unreasonable force during a lawful arrest," and that "[i]n the alternative, under the facts of this case, [Investigator Killingsworth] had probable cause to arrest Ines Garcia but . . . used more force than was objectively reasonable under the circumstances."[11]   (*Id.* at ¶¶ 68-69.)

In response, Defendants again assert that "Investigator Killingsworth is entitled to qualified immunity from Garcia's excessive force claim." (Doc. 29 at 21.)  In that the court has already determined that Investigator Killingsworth was acting within the scope of his discretionary authority when determining how much force to apply when arresting Garcia, *see supra* Part III.A.1, the burden is on Garcia to show that qualified immunity is not appropriate under the Supreme Court's two prong test, *see Vinyard*, 311 F.3d at 1346-47.

As to the first prong, it is well established that "[t]he Fourth Amendment's freedom from unreasonable searches and seizures encompasses the right to be free from excessive force during the course of a criminal apprehension." *Oliver*, 586 F.3d at 905.  In determining whether an officer's use of force is excessive, "[t]he question is whether the officer's conduct is objectively reasonable in light of the facts confronting the officer." *Vinyard*, 311 F.3d at 1347 (citing *Graham v. Connor*, 490 U.S. 386, 394 (1989)).  Further, the "[u]se of force must be judged on a case-by-case basis 'from the perspective of a reasonable officer on the scene,

---

[11] Garcia correctly pleads Count II in the alternative, alleging that Investigator Killingsworth had probable cause to arrest Garcia.  (*See* Doc. 14 at 8-10.)  This is necessary because, as stated by the Eleventh Circuit, "if an arresting officer does not have the right to make an arrest, he does not have the right to use any degree of force in making that arrest." *Bashir v. Rockdale County, GA*, 445 F.3d 1323, 1332 (11th Cir. 2006).  But, in that scenario, the excessive force claim would be subsumed into the false arrest claim. *Id.*  On the other hand, "a claim for excessive force during a legal stop or arrest is a discrete claim." *Jackson v. Sauls*, 206 F.3d 1156, 1171 (11th Cir. 2000).

rather than 20/20 vision of hindsight.'" *Post v. City of Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993), *modified on other grounds by* 14 F.3d 583 (11th Cir. 1994) (quoting *Graham*, 490 U.S. at 386, 394).

"A court looks to the 'totality of circumstances' to determine whether the manner of arrest was reasonable." *Draper v. Reynolds*, 369 F.3d 1270, 1277 (11th Cir. 2004) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)).  Factors include "(1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted." *Id.* at 1277-78 (quoting *Lee*, 284 F.3d at 1198)). Furthermore, in determining the need for the application of force, courts should consider "such factors as 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Durruthy*, 351 F.3d at 1094 (quoting *Lee*, 284 F.3d at 1197-98).  That said, the Eleventh Circuit "has made clear that some use of force by a police officer when making a custodial arrest is necessary and altogether lawful, regardless of the severity of the alleged offense." *Id.* (citing *Lee*, 284 F.3d at 1197); *see also Vinyard*, 311 F.3d at 1348 n.13 (reiterating that "'[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment'" (quoting *Saucier*, 533 U.S. at 209, *overruled on other grounds by Pearson*, 129 S. Ct. 808)).  Indeed, "'the application of de minimis force, without more, will not support a claim for excessive force in violation of the Fourth Amendment.'" *Durruthy*, 351 F.3d at 1094 (quoting *Nolin v. Isbell*, 207 F.3d 1253, 1257 (11th Cir. 2000)).

18

"Painful handcuffing, without more, is not excessive force in cases where the resulting injuries are minimal," even if the arrestee was not actively resisting arrest; such force is instead de minimis force, and not a violation of the Fourth Amendment. *See Rodriguez v. Farrell*, 280 F.3d 1341, 1351-53 (11th Cir. 2002) (citing *Nolin*, 207 F.3d at 1257-58) (reversing district court's denial of police officers' motion for summary judgment). In *Rodriguez v. Farrell*, the Eleventh Circuit considered the case of a police officer who "grabbed plaintiff's arm, twisted it around plaintiff's back, jerking it up high to the shoulder and then handcuffed plaintiff as plaintiff fell to his knees screaming that [the officer] was hurting him." *Id.* at 1351. The plaintiff had insisted that the force applied by the officer was clearly excessive, in part because he was "peaceful, cooperative, non-resistive, and was never considered to be a threat by the police officers involved." Initial Brief of the Plaintiff, Appellee at 33, *Rodriguez*, 280 F.3d 1341 (No. 00-13147), 2000 WL 33982580. Nevertheless, the Eleventh Circuit acknowledged that "the handcuffing technique used by [the officer] is a relatively common and ordinarily accepted non-excessive way to detain an arrestee." *Id.* at 1351. What's more, that the officer's handcuffing technique exacerbated a preexisting injury to the plaintiff's arm, which required "twenty-five subsequent surgeries and ultimately amputation of the arm below the elbow," was "not important legally" to the court. *See id.* at 1351-53. Instead, the Eleventh Circuit expressly "recognize[d] that the typical arrest involves some force and injury," and reasoned that "[w]hat would ordinarily be considered reasonable force does not become excessive force when the force aggravates (however severely) a pre-existing condition the extent of which was unknown to the officer

19

at the time." *Id.* As a result, the Eleventh Circuit held that the officer's use of force was de

minimis and therefore objectively reasonable under the circumstances, and thus not excessive

force in violation of the Fourth Amendment.[12]  *See id.* at 1353.

As to the second prong of the two prong test, whether the right to be free from

excessive force was clearly established at the time of the time of the alleged violation, "[the

Eleventh Circuit has] noted that generally no bright line exists for identifying when force is

excessive; . . . therefore . . . unless a controlling and materially similar case declares the

official's conduct unconstitutional, a defendant is usually entitled to qualified immunity."

*Priester*, 208 F.3d at 926 (citing *Smith v. Mattox*, 127 F.3d 1416, 1419 (11th Cir. 1997)).

The "narrow exception" to this general rule, where the case is one of obvious clarity,

requires the plaintiff to show that "*every* reasonable officer in [the defendant's] position

[would] conclude the force was unlawful." *See Post*, 7 F.3d at 1559 (emphasis added).  In

sum, for Garcia to establish that qualified immunity is not appropriate under the two prong

test, and because the court is aware of no materially similar case that staked out a bright line

to put Investigator Killingsworth on fair and clear notice that his use of force was

excessive,[13] Garcia must show not only that the force used by Investigator Killingsworth

---

[12] The court noted that, "[i]n the alternative, [it] conclude[d] that [the officer was] entitled to qualified immunity on the excessive force claim."  *Rodriguez*, 280 F.3d at 1353 n.21.

[13] Although Garcia cites numerous cases to support his argument that a bright line existed that put Investigator Killingsworth on fair and clear notice that his use of force was excessive, (*see* Doc. 31 at 28-34), the court disagrees and finds the cases to be materially distinguishable.  Indeed, the controlling cases cited by Garcia either involve: officers who had applied excessive force after restraining the arrestee with handcuffs, *see, e.g.*, *Davis v. Williams*, 451 F.3d 759, 767-78 (11th Cir. 2006) (involving officer who tore arrestee's rotator cuff by forcibly grabbing arrestee and pushing

during the arrest was not objectively reasonable, but moreover that every reasonable officer in Investigator Killingsworth's position would agree.

Here, for the purposes of this motion, the facts, with their reasonable inferences, are that Garcia, who stands approximately five feet nine inches tall and weighs 195 pounds, made a false comment about police brutality loudly enough to be heard ten to fifteen yards away. (*See* Doc. 26, Ex. A at 100-01, 155-56, Ex. B at 19-20, Ex. D at 23-28, 31-32, Ex. E at 35-38, 70-74, Ex. J; Doc. 29 at 4-5; Doc. 31 at 7-8.) Garcia made the remark at night in a well-lit but crowded, public place while leaving a mixed martial arts event, an event where fighting had been occurring between the spectators as well as the participants. (*See* Doc. 26, Ex. A at 94, 117-18, 195.) Investigator Killingsworth had probable cause to arrest Garcia for the nonviolent misdemeanor of public intoxication, *see supra* note 11, and began to follow Garcia as Garcia walked away alongside Monroe Street. (Doc. 26, Ex. A at 115-16, 174-76.) However, Garcia voluntarily stopped when Investigator Killingsworth informed

---

him to the ground, dragging arrestee on the ground, and forcibly throwing arrestee into a dog cage, all while unresisting arrestee was already in handcuffs), officers who had applied excessive force after making the arrestee lie face down on the ground, *see Smith*, 127 F.3d at 1418 (involving officer who broke arrestee's arm after unresisting arrestee was lying face down on the ground and after officer had placed his knee into arrestee's back), plaintiffs who had not alleged excessive force, *see Peoples v. Campbell*, 377 F.3d 1208, 1224-26 (11th Cir. 2004) (denying federal habeas corpus relief on wrongful arrest claim), plaintiffs who had not alleged excessive force under the Fourth Amendment, *see, e.g.*, *Johnson v. Breeden*, 280 F.3d 1308, 1311-12 (11th Cir. 2002) (involving prisoner who claimed excessive forth constituted cruel and unusual punishment in violation of the Eighth Amendment), or plaintiffs who had alleged excessive force under the Fourth Amendment, but who had attempted to support their claim by relying on the inapplicable rule that any use of force in effecting an unlawful arrest is excessive, *see, e.g.*, *Bashir*, 445 F.3d at 1332-33 (upholding summary judgment in favor of officer because plaintiff's excessive force claim was "inseparable from his unlawful arrest claim"); *see supra* note 11.

him that he was under arrest for public intoxication.  (*Id.* at 183-84.)  Garcia put his hands

behind his back for Investigator Killingsworth to place handcuffs around his wrists, and, at

that time, did not appear to be resisting or attempting to escape.  (*Id.* at 184-85.)  Investigator

Killingsworth approached Garcia, grabbed Garcia's arm, twisted it up and around Garcia's

back, causing a "pop" in his right elbow, and then Investigator Killingsworth bowed Garcia

over, all while handcuffing him.  (*Id.* at 184-88, 220, Ex. Q, Ex. R.)  The incident caused

Garcia "severe pain and mental anguish."  (*Id.* at 184-86; Doc. 31 at 14.)  "[A] couple of

weeks, maybe a month or so after" the incident, Garcia sought medical attention for his right

elbow, and was referred to Dr. Phillip Maddox.  (Doc. 26, Ex. A at 226-27, Ex. Y, Ex. Z.)

Dr. Maddox diagnosed Garcia with synovitis in his right elbow,[14] and informed Garcia of

alternative treatment options, including waiting to see if the elbow would heal on its own

with medication, or, in the alternative, performing arthroscopic surgery.  (*Id.*, Ex. A at 226-

30, Ex. F at 13-14, 22-23, Ex. Y.)  Dr. Maddox testified that surgery was "probably not"

"absolutely necessary," but that it was "a very reasonable option."  (*Id.*, Ex. F at 22-23.)

Garcia elected to undergo surgery, which proceeded without complication, but Garcia

nonetheless remains in physical pain; Garcia suffers from decreased function in his arm, and

also suffers emotionally and mentally from the incident itself.  (*Id.*, Ex. A at 226-40, Ex. Y,

Ex. Z.)

---

[14] As Defendants correctly point out, although Garcia claims that Dr. Maddox diagnosed him with torn tendons and/or ligaments in his right elbow, Dr. Maddox did not; instead, Dr. Maddux diagnosed Garcia as suffering from synovitis of the right elbow.  (*See* Doc. 26, Ex. A at 228, , Ex. F at 11-16, Ex. Y.)  *See also supra* note 4.

In determining whether Investigator Killingsworth used excessive force in arresting Garcia, the court notes the analogies between this case and *Rodriguez v. Farrell*. Indeed, under Garcia's version of the event, the handcuffing technique used by Investigator Killingsworth is substantially similar to the handcuffing technique used by the officer in *Rodriguez*, a technique the Eleventh Circuit recognized as "a relatively common and ordinarily accepted non-excessive way to detain an arrestee." 280 F.3d at 1351. The differences between this case and *Rodriguez*, however, are that Garcia suffered a less serious physical injury from the force used by Investigator Killingsworth than the plaintiff in *Rodriguez*.[15] Indeed, if not for the fact that Garcia and Dr. Maddox contend that the use of force resulted in a new injury to his elbow rather than merely "aggravat[ing] (however severely) a pre-existing condition" to his right arm, this court's decision would be far more clear. *See id.* at 1351-53. Even so, in this court's endeavor to determine whether Investigator Killingsworth's use of force was objectively reasonable under the circumstances, it remains clear that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. And, although Garcia had not resisted or attempted escape when informed by Investigator Killingsworth that he was under arrest,

---

[15] Still, as Garcia recognizes in his Supplemental Case Law Based on New Supreme Court Decision, (Doc. 47 at 1), the Supreme Court has recently reiterated, albeit in the context of an excessive force claim under the Eighth Amendment, that "[i]njury and force . . . are only imperfectly correlated, and it is the latter that ultimately counts," *Wilkins v. Gaddy*, 130 S. Ct. 1175, 1178 (2010).

it also remains that Garcia was publicly intoxicated and had earlier made a comment about police brutality after leaving a mixed martial arts event.  For these reasons, and even with all disputed facts and reasonable inferences drawn in his favor, the court finds that Garcia has not met his burden of showing that "*every* reasonable officer in [Investigator Killingsworth's] position [would] conclude the force was unlawful."  *See Post*, 7 F.3d at 1559 (emphasis added).   As a result, the court is of the opinion that Investigator Killingsworth's Motion for Summary Judgment is due to be granted as to Count II.

**B.      GARCIA'S STATE LAW CLAIMS (COUNTS III, IV, AND IV)**

Defendants also maintain that summary judgment is due to be granted in their favor regarding claims brought by Garcia under Alabama law, i.e. Counts III and IV of the Amended Complaint, which allege false imprisonment and assault and battery against both Defendants, and the second Count IV, which alleges malicious prosecution against Investigator Killingsworth.  (Doc. 29 at 22.)  Primarily, Defendant Killingsworth argues that he is "entitled to discretionary function immunity from all of these state-law claims" pursuant to section 6-5-338 of the Alabama Code.  (Doc. 29 at 22.)  Defendant COH contends it is immune from tort liability pursuant to the combined effect of Alabama Code sections 6-5-338(b) and 11-47-190.  (*Id.*)

1.      Garcia's State Law Claims Against Investigator Killingsworth

Section 6-5-338(a) of the Alabama Code states the rule for statutory discretionary

function immunity for peace officers,[16] providing in pertinent part that:

> Every peace officer . . . who is employed or appointed pursuant to the Constitution or statutes of this state . . . and who is empowered by the laws of this statute to execute warrants, to arrest and to take into custody persons who violate, or who are lawfully charged by warrant, indictment, or other lawful processes, with violations of, the criminal laws of this state, shall at all times be deemed to be officers of this state, and as such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties.

Ala. Code § 6-5-338(a) (1975).  In 2000, the Alabama Supreme Court, in *Ex Parte Cranman*, set out a "restatement of State-agent immunity," and later, in 2004, modified the fourth of five categories regarding what constitutes a discretionary function so as to include section 6-5-388(a).  *See Ex Parte City of Tuskeegee*, 932 So.2d 895, 903 (Ala. 2005).  "The restatement of State-agent immunity as set out in *Cranman*, . . . now governs the determination of whether a peace officer is entitled to immunity under § 6-5-338(a)."  *Id.* (citing *Swan v. City of Hueytown*, 920 So. 2d 1075, 1078 (Ala. 2005)).  In pertinent part, the rule governing discretionary function immunity, or "State-agent immunity," now provides that:

> A State agent *shall* be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's . . . (4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons, *or serving as peace officers under circumstances entitling such officers to immunity pursuant to § 6-5-338(a), Ala. Code 1975.*

*Hollis v. City of Brighton*, 950 So. 2d 300, 309 (Ala. 2006) (quoting *Cranman*, 792 So. 2d

---

[16] As a police officer, Investigator Killingsworth is a peace officer within the meaning of the statute.  *Gibson v. City of Greenville*, No. 2:08CV127-SRW, 2010 WL 434717, at *11 (M.D. Ala. Feb. 2, 2010) (citing *Couch v. City of Sheffield*, 708 So. 2d 144 (Ala. 1998)).

392, 405 (Ala. 2000)) (internal quotation marks omitted).  However, State-agent immunity

is not absolute, and *Cranman* recognizes two exceptions:

> Notwithstanding anything to the contrary in the foregoing statement of the rule, a
> State agent *shall not* be immune from civil liability in his or her personal capacity .
> . . (1) when the Constitution or laws of the United States, or the Constitution of this
> State, or laws, rules, or regulations of this State enacted or promulgated for the
> purpose of regulating the activities of a governmental agency require otherwise; or
> . . . (2) when the State agent acts willfully, maliciously, fraudulently, in bad faith,
> beyond his or her authority, or under a mistaken interpretation of the law.

*City of Tuskeegee*, 932 So. 2d at 903 (quoting *Cranman*, 792 So. 2d at 405) (internal

quotation marks omitted).

As with qualified immunity under § 1983, the Alabama Supreme Court has likewise

recognized a "'burden-shifting' process when a party raises the defense of State-agent

immunity." *Ex parte Kennedy*, 992 So. 2d 1276, 1282 (Ala. 2008) (citing *Ex parte Estate*

*of Reynolds*, 946 So. 2d 450, 452 (Ala. 2006)).  "A State agent asserting State-agent

immunity 'bears the [initial] burden of demonstrating that the plaintiff's claims arise from

a function that would entitle the State agent to immunity.'"  *Id*. (citing *Estate of Reynolds*,

946 So. 2d at 452).  Should he do so, "the burden then shifts to the plaintiff to show that one

of the two categories of exceptions to State-agent immunity recognized in *Cranman* is

applicable."  *Id*.

a.    *Whether Garcia's Claims Arise from a Function that Entitles Investigator*
      *Killingsworth to State-Agent Immunity*

Like the scope of discretionary authority under § 1983, *see supra* Part III.A.1, under

26

Alabama law, "[d]iscretionary functions are broadly defined as those acts as to which there is no hard and fast rule as to the course of conduct that one must or must not take and those acts requiring exercise in judgment and choice and involving what is just and proper under the circumstances." *See Borders v. City of Huntsville*, 875 So. 2d 1168, 1178 (Ala. 2003) (quoting *Ex parte Duvall*, 782 So. 2d 244, 248 (Ala. 2000)) (internal quotation marks omitted). "Generally, arrests and attempted arrests are classified as discretionary functions." *Id.* (citing *Telfare v. City of Huntsville*, 841 So. 2d 1222 (Ala. 2002)). In the instant case, as the court discussed above with respect to Garcia's § 1983 claims, *see supra* Part III.A.1, Investigator Killingsworth's actions in arresting Garcia and in determining the necessary force to use in making the arrest constituted discretionary functions under *Cranman*. *See, e.g.*, *Byther v. City of Mobile*, 398 F. Supp. 2d 1222, 1239 (S.D. Ala. 2005); *Kennedy*, 992 So. 2d at 1283.

b.      *Whether a Cranman Exception Applies*

Because "[Garcia's] claims arise from a function that would entitle [Investigator Killingsworth] to immunity . . . the burden . . . shifts to [Garcia] to show that one of the two categories of exceptions to State-agent immunity recognized in *Cranman* is applicable." *See Borders*, 875 So. 2d at 1178. Garcia's Brief in Opposition to Defendants' Motions for Summary Judgment raises three arguments regarding the *Cranman* exceptions with respect to Investigator Killingsworth. (*See* Doc. 31 at 16, 34-35; Doc. 14 at ¶¶ 49-50, 86, 89.) The court will address each argument in turn.

27

First, Garcia alleges that Investigator Killingsworth acted beyond his authority because "[i]n Alabama a police officer lacks authority to effect a misdemeanor arrest without a warrant unless the arrestee commits the offense in the officer's presence and a police officer lacks probable cause to effect a misdemeanor arrest without a warrant unless the arrestee commits the offense in the officer's presence." (Doc. 31 at 34.)  While Garcia is correct that Alabama Code section 15-10-3(a) requires that, "for an officer to arrest a person without a warrant for the commission of a misdemeanor, the violation of a city ordinance or a threatened breach of the peace, the infraction must have been committed in the presence of the officer,"[17] *see State v. Phillips*, 517 So. 2d 648, 651 (Ala. Crim. App. 1987) (citing *Jakes v. State*, 398 So. 2d 342 (Ala. Crim. App. 1981)), the court finds that Garcia committed the actions that gave rise to his arrest in the presence of Investigator Killingsworth.  Indeed, "[t]he term 'in his presence' has been construed to authorize an arrest where an officer was apprised or could infer through the operation of any of his senses that a misdemeanor was being committed or attempted." *Id.* (citing *Jakes*, 398 So. 2d 342).  In the instant case, even with all disputed facts and reasonable inferences drawn in Garcia's favor, the court finds that from the time Garcia initially made the comment about police brutality until Investigator Killingsworth arrested him for public intoxication, Garcia was, at all times, within Investigator Killingsworth's presence.  *See supra* Part II.D-E.  Indeed, Garcia specifically

---

[17] In pertinent part, section 15-10-3(a) states that "[a]n officer may arrest any person without a warrant, on any day and at any time, for . . . [a]ny public offense committed or a breach of the peace threatened in his presence."  Ala. Code. § 15-10-3(a)(1).

alleges that Investigator Killingsworth continued to follow him after he made the comment about police brutality.  (*See* Doc. 31 at 11.)  Therefore, Garcia's first argument is unavailing.

Next, Garcia claims that "the violation of statutes or a police department's rules may eliminate an officer's discretion, making discretionary immunity unavailable."  (Doc. 31 at 34-35 (citing *Borders*, 875 So. 2d 1168).)  To be sure, Garcia is again correct that the COH, at the time of the incident, maintained a formal written policy (the "Policy"), which prohibited the use of excessive force by its officers.  (*See* Doc. 33 at Ex. 1.)  The Policy provides in part that the COH's police officers "will use only the degree of force necessary to accomplish lawful objectives," and further states that "[n]othing in this directive will constitute justification for reckless or criminally negligent behavior amounting to an offense against persons."  (*Id.* § 2.)  However, despite the existence of the Policy, the court finds that nothing in the Policy itself demonstrates that Investigator Killingsworth acted beyond his authority when determining the reasonably necessary force to use when arresting Garcia. Instead, the Policy allows for discretion, stating that "[f]orce may be used as reasonably necessary to lawfully . . . 1. [d]efend oneself or others, 2. [o]vercome resistance or enforce compliance, or 3. [p]revent escape."[18]  (*See id.* § 7.)  Accordingly, for the same reasons stated above regarding Garcia's claim that Investigator Killingsworth applied excessive force under

---

[18] Thus, this case is distinguishable from *Scheuerman v. City of Huntsville*, cited by Garcia. (*See* Doc. 31 at 35.)  In that case, the court found that an investigative officer acted beyond his authority by failing to notify the unit dispatcher when making a traffic stop, and by firing shots at an unarmed suspect; a Huntsville Police Department written directive unambiguously forbade such use of deadly force, and required that officers provide the unit dispatcher with certain information when making traffic stops.  *See Scheuerman*, 499 F. Supp. 2d 1205, 1208-10, 1225-26 (N.D. Ala. 2007).

§ 1983, i.e. Count II of the Amended Complaint, *see supra* Part. III.A.2.b, the court finds Garcia's second argument to be unpersuasive.

Lastly, although not specifically argued by Garcia in his brief, Garcia has alleged that Investigator Killingsworth acted "willfully" and "maliciously" in arresting Garcia. (*See* Doc. 14 at ¶¶ 49-50, 86, 89; Doc. 31 at 16, 34-35.)  The Alabama Supreme Court, in *Borders v. City of Huntsville*, considered a similar situation, i.e. "[w]hether a peace officer making a warrantless arrest on a charge based upon conduct the officer witnessed is entitled to discretionary-function immunity in a subsequent civil action."  875 So. 2d at 1179.  The United States District Court for the Middle District of Alabama summarized the Alabama Supreme Court's holding:

> Recognizing the tension between good-faith but mistaken acts, which are entitled to discretionary immunity, and bad-faith, malicious acts, which are not, the *Borders* court held that "the standard of 'arguable probable cause' should govern in this case." Under the "arguable probable cause" standard, therefore, the court must ask whether, construing the evidence in the light most favorable to the plaintiff, "no reasonable police officer could have believed that he had probable cause to arrest."

*Harris v. City of Prattville*, No. 2:07-cv-349-WHA, 2008 WL 2704684, at *16 (M.D. Ala. July 8, 2008) (quoting *Borders*, 875 So. 2d at 1179-80) (internal citation omitted).

In the instant case, for the same reasons aforementioned with respect to Garcia's claim that Investigator Killingsworth lacked arguable probable cause to arrest him under § 1983, i.e. Count I of the Amended Complaint, *see supra* Part III.A.2.a, the court likewise finds that Garcia has failed to show that "no reasonable police officer could have believed that he had probable cause to arrest" Garcia for public intoxication. *See Borders*, 875 So. 2d at 1179-80;

*see also Byther*, 398 F. Supp. 2d at 1239.[19]   Therefore, because all of Garcia's arguments

with respect to the state law claims brought against Investigator Killingsworth are without

merit, the court finds that Investigator Killingsworth's Motion for Summary Judgment is due

to be granted as to Counts III, IV, and the second Count IV.


2.      Garcia's State Law Claims Against the COH

        Regarding Garcia's claims against the COH, i.e. Count III, "False Imprisonment," and

Count IV, "Assault and Battery," (Doc. 14 at ¶¶ 82-88), Garcia alleges only that "Huntsville

can be responsible for negligent conduct," and that "[s]ince Killingsworth is not entitled to

immunity, neither is Huntsville," (Doc. 31 at 35).   By contrast, Defendants argue that the

COH is immune from all tort liability pursuant to the combined effect of sections 6-5-338(b)

------

    [19] It is necessary to note that while this court did not look to decisional law from Alabama
intermediate state courts "to 'clearly establish' the law" with respect to Garcia's § 1983 claims, *see*
*Poulakis*, 341 F. App'x at 528 (footnote omitted) (noting that "decisional law drawn from
intermediate state courts is too unsettled and too readily subject to split authority to put an officer
on clear notice that his conduct would be unlawful"), a different rule applies regarding Garcia's state
law claims, *see, e.g.*, *Hardy v. Town of Hayneville*, 50 F. Supp. 2d 1176, 1200-01 (M.D. Ala. 1999).
For these claims:

        The law is clear that where . . . the state supreme court has not addressed the issue,
        "[a] federal court applying state law is bound to adhere to decisions of the state's
        intermediate appellate courts absent some persuasive indication that the state's
        highest court would decide the issue otherwise."   This is true, even if the federal
        court does not agree with that state court's reasoning or the outcome which the
        decision dictates.

*Pravau v. State Farm Mut. Auto. Ins. Co.*, 772 F.2d 817, 820 (11th Cir. 1985) (citations omitted).
For all that, Garcia has not cited to any Alabama intermediate state court caselaw, nor is the court
aware of any, which demonstrates that Investigator Killingsworth lacked arguable probable cause
to arrest Garcia for public intoxication, or that shows Investigator Killingsworth applied excessive
force in effecting the arrest.

31

and 11-47-190 of the Alabama Code.[20]   (Doc. 29 at 22.)  The court agrees.

Indeed, section 6-5-338(b) of the Alabama Code extends statutory discretionary function immunity under section 6-5-338(a) to a peace officer's employing municipality.  *See* Ala. Code. § 6-5-338(b) ("This section is intended to extend immunity only to peace officers and governmental units or agencies authorized to appoint peace officers."); *see also Howard v. City of Atmore*, 887 So.2d 201, 211 (Ala. 2003) ("It is well established that, if a municipal peace officer is immune pursuant to § 6-5-338(a), then, pursuant to § 6-5-338(b), the city by which he is employed is also immune.") (citation omitted).  Furthermore, as Defendants correctly point out, section 11-47-190 of the Alabama Code limits municipal liability "to claims based on the 'neglect, carelessness or unskillfulness' . . . of [the municipality's] agents and employees."  (Doc. 29 at 27.)  *See also City of Tuskegee*, 932 So. 2d at 910 ("[Section 11-47-190] limits a municipality's liability for the acts of its agents to those acts that are negligent, careless, or unskillful" and provides for "municipality immunity from liability for the acts of its agents that are carried out in bad faith or with malice." (citing *Borders*, 875 So. 2d at 1183)).  Therefore, not only would the COH be immune under section 6-5-338(b), in that Investigator Killingsworth is immune under section 6-5-338(a), *see supra* Part III.B.1.b,

---

[20] Section 11-47-190 states in pertinent part that:

> No city or town shall be liable for damages for injury done to or wrong suffered by any person or corporation, unless such injury or wrong was done or suffered through the neglect, carelessness, or unskillfulness of some agent, officer, or employee of the municipality engaged in work therefor and while acting in the line of his or her duty . . . .

Ala. Code. § 11-47-190.

but the COH is also immune pursuant to the combined effect of sections 6-5-338(b) and 11-47-190, *see Hardy*, 50 F. Supp. 2d at 1199 ("Though section 11-47-190 allows recovery against a municipality for injuries resulting from 'neglect, carelessness or unskillfulness of some agent, officer or employee of the municipality' when acting in the line of his or her duty, section 6-5-388 grants immunity from claims based on negligence.").  For these reasons, the court finds that the COH's Motion for Summary Judgment is due to be granted.

## C.   GARCIA'S MOTION IN LIMINE (DOC. 39)

On January 15, 2010, Garcia filed a Motion in Limine, asking that the court enter an order excluding certain evidence from trial, including voir dire.  (Doc. 39 at 1.)  However, because Defendants' Motions for Summary Judgment, (Docs. 24 & 25), are due to be granted as to all counts, Garcia's Motion in Limine is due to be denied as moot.

## IV.  CONCLUSION

For the foregoing reasons, the court is of the opinion that Defendants' Motions for Summary Judgment, (Docs. 24 & 25), are due to be granted.  As a result, Garcia's Motion in Limine, (Doc. 39), is due to be denied as moot.  An Order in conformity with this Memorandum Opinion will be entered contemporaneously.

33

**DONE**, this the 16th day of September, 2010.


SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE